THE NEW JERSEY ZINC COMPANY, appellants, *and* THE BOSTON FRANKLINITE COMPANY, respondents.

Decided at November Term, 1862.

The Sussex Zinc Company agreed, under seal, to transfer to the New Jersey Zinc Company all their stock and all their property, real and personal. Both parties applied to the legislature, and procured an act authorizing it to be done. Under the agreement and act, the Sussex Company transferred to the other company all its stock, 21,849 shares, not issued to individuals, and all its stockholders transferred all their shares, 26,151, and the New Jersey Zinc Company issued a like amount, 48,000 shares, of their own stock in payment. A year afterwards, while three of the directors of the Sussex Company had not yet transferred thirty shares out of the 48,000 to the Zinc Company, they applied to the legislature, and got the name of the Sussex Company changed to that of the Franklinite Company, and 48,000 shares of additional stock, and then also transferred the said thirty shares of old stock.

*Held*, 1st. That, by these proceedings, the New Jersey Zinc Company became entitled in equity to all the property owned by the Sussex Company

at the time of the transfer of the stock, and that Chancery will protect the former in its use.

2d. That the Franklinite Company, as regards the property owned by the Sussex Company at the time of said transfer of stock, is a new corporation, and as such has no title, either equitable or legal, to the property the Sussex Company had so agreed to convey.

3d. If the Franklinite Company is not a new corporation, but the Sussex Company under a new name, then the increased stock, as well as the old stock, belongs in law and equity to the Zinc Company, as owners of the old stock.

A deed conveys to the Zinc Company "all the zinc ores in the following described premises," going on describing them by metes and bounds; and then adds, "and also all the estate, right, and title of the said parties of the first part in the before described premises."

*Held* that it conveyed all the right of the parties of the first part in the described premises.

A deed conveys to the grantee all the zinc and other ores, except the ore called franklinite and iron ore, where it exists separate from the zinc, "to have and to hold all the zinc and other ores, except the ore called franklinite, where it exists separate and distinct from the zinc."

*Held*, that the deed conveys all the zinc ores when the franklinite was mixed mechanically with the zinc.

A deed conveys all the zinc and other ores, and excepts the ore called franklinite; the complainant claims a vein of ores as passing by the name of zinc, the defendants claim the same vein as excepted under the name of franklinite.

*Held*, that what was meant by the word zinc might be explained by evidence *dehors* the deed, and that under such evidence the vein in dispute passed under the name of zinc.

To arrive at the true construction of the word "premises," as used in this deed, it is competent for the court to resort to the previous written agreement between the parties, in fulfilment of which the deed was read, to ascertain from that what the grantors contracted to convey.— *Per* BROWN, J.

This was an appeal from the decision of the Chancellor, reported in 2 *Beasley, p.* 322.

*Bradley* and *Zabriskie*, for appellants.

*Hamilton* and *McCarter*, for respondents.

The following opinions were delivered in the Court of Appeals.

VREDENBURGH, J.   The Boston Franklinite Company hold under the mortgage and sheriff's deed from the New Jersey Franklinite Company.   Their cross-bill shows that the rights of the New Jersey Zinc Company are excepted out of their deed, and that they are chargeable with notice of the proceedings of the first mentioned suit, and only claim to represent the rights of the New Jersey Franklinite Company. We may therefore consider the New Jersey Zinc Company, complainants, and the New Jersey Franklinite Company, defendants, as the only litigants here, and which for brevity I shall hereafter call the Zinc Company and the Franklinite Company.

There is in the county of Sussex a tract of land, of about 92 acres, called Mine-hill.   Nearly through its centre runs, north and south, a vein of ore, composed of zinc ores and a peculiar kind of iron or zinc ore called franklinite, mixed mechanically together like wheat and chaff in the same bushel.

In 1857, both parties were taking ore out of it.   Chancery has perpetually enjoined the Zinc Company, and permitted the other to go on, and the question, which of these parties has in a court of equity the better right to the use of this vein, is now before us for final adjudication.

Both parties claim title through a deed, dated the 10th of March, 1848, from Samuel Fowler to a corporation called the Sussex Zinc Company.   Both parties claim under this Sussex Company.   The Zinc Company claim that, in 1851 and 1852, the said Sussex Company sold and transferred all their legal and equitable estate in this vein to them.   The Franklinite Company claim that no such transfer was ever made to the Zinc Company, and that the legislature, on the 26th of January, 1853, changed the name of the Sussex Company to that of the New Jersey Franklinite Company, and that they, too, are the Sussex Company under a new name, and as such own this vein.   Upon this issue Chancery has decreed in favor of the Franklinite Company.

The question to be solved therefore is, whether the Sussex

Company, now called the Franklinite Company, have transferred their right, equitable or legal, in this vein to the Zinc Company.

I shall first inquire as to the condition of the equitable title.

This Sussex Company was chartered in January, 1848. In 1849, another company was chartered, by the name of the New Jersey Exploring and Mining Company, whose name, in 1852, was also changed to that of the New Jersey Zinc Company, who are the present complainants. On the 4th of September, 1851, before the name of either party was changed, these two companies came together, and entered into an agreement, under their respective corporate seals, in the following words: "This agreement, made at the city of Newark, state of New Jersey, this 4th day of September, 1851, between the Sussex Company and the Exploring Company, both corporations chartered by the legislature of the state of New Jersey, witnesseth that, for the mutual interest of both the said companies, they have agreed to *unite their properties*, and to carry on their joint business under one organization, that of the Exploring Company. The Sussex Company agree hereby to convey to the said Exploring Company all the real and personal estate of the said Sussex Company, and all mines and minerals, leases and rights, and all the capital stock belonging to the said company not issued to individuals; and the said Exploring Company agree to recognize and admit the whole stock of the said Sussex Company to the same dividends as the stock of the said Exploring Company, and the individuals now holding the stock of the said Sussex Company shall be entitled, equally with the holders of the stock of the Exploring Company, to all dividends and to all the properties, both real and personal, of the said companies. The Exploring Company is to sell and dispose of the stock of the said Sussex Company not already issued, and agrees to apply the proceeds thereof in extending the manufacturing works now owned by the said Exploring Company, and to the payment of all debts or demands against

either company, and in any other way which may tend to promote the joint interest of the respective stockholders.

This union is based upon the principle of entire equality between the individual stockholders composing shareholders of each company. It is contemplated to apply to the legislature of New Jersey for an increase of capital stock of the Exploring Company to an amount equal to that of the Sussex Company; and in case of such increase, then the said stock of the said Sussex Company is to be surrendered, and the said stock of the said Exploring Company issued in lieu thereof. The real estate of the said Sussex Company and all personal property is to be transferred to the said Exploring Company, thus forming a complete union, and bringing together and uniting under one charter all the property, rights, or advantages now owned and enjoyed by both said companies. But until such legislative sanction shall be obtained, the entire management of the joint property shall be vested in the Exploring Company, and all dividends shall be declared and paid equally upon the issued stock of both companies.—In witness whereof, the presidents of the two companies have hereunto respectively set their hands and affixed the corporate seals of the respective companies the day and year first above written.

[SEAL.]                          JAMES L. CURTIS,
                         *Pres't of the Exploring Company.*

[SEAL.]                          J. ELNATHAN SMITH,
                         *Pres't of the Sussex Company.*

Witness—Thomas Duguid."

Under this agreement both parties did, at the next session of the legislature, apply and obtain, on the 12th of February, 1852, an act in the following words, viz: "A supplement to an act entitled, an act to incorporate the Exploring Company.

"Whereas it has been thought expedient, by parties owning certain zinc mines in the county of Sussex, state of New Jersey, for the purpose of more economically working and

developing the same, to place such mines under the management of one corporation; and whereas an arrangement by and between the Exploring Company and the Sussex Company is contemplated—in accordance with such views—

1. Be it enacted, that the Exploring Company shall hereafter be known, in fact and in name, by the name of 'the New Jersey Zinc Company,' and by that name shall hereafter be a body politic and corporate, and shall possess and exercise all the corporate powers and franchises, and be subject to all the liabilities and restrictions of the said exploring and mining companies.

2. That the New Jersey Zinc Company is hereby authorized to purchase and receive, and the Sussex Company is hereby authorized to transfer all the mines and mineral rights, or any portion thereof now held or owned by the said Sussex Company, upon such terms as the two companies may agree upon; and the capital stock of the said Zinc Company may be increased, and its stock issued for the purchase of mines and mineral rights to the amount heretofore authorized by the charter of the said companies.

3. That the directors of the Zinc Company may be increased to twelve.

4. The Zinc Company performed faithfully *all* the agreement on their part to be performed. Their part of the agreement was to recognize and admit the whole stock of the Sussex Company to the same dividends as their own stock; and in case of the increase of the zinc stock by the legislature, then the stock of the Sussex Company was to be surrendered, and the Zinc Company issue their own stock in lieu thereof. This they have fully done. Thus Major Farrington says: 'The individual shareholders of the Sussex Company, in pursuance of the agreement between the two companies, surrendered their stock certificates to the Zinc Company, and received a corresponding number of shares in the stock of the Zinc Company. The stock that had not been issued by the Sussex Company was sold by the Zinc Company, and the proceeds applied for the uses and benefits

of said company, and the act of union, as contemplated by the agreement referred to, was considered as perfected and fully consummated.'"

James L. Curtis, another of the main witnesses of the Boston Company, says : "I was one of the first directors of both the Sussex and the Exploring companies. There was an agreement entered into between them, in 1851, to transfer the property of the Sussex Company to the Exploring Company, which was carried into effect. The Sussex Company conveyed its rights to the Zinc Company. I held several thousand shares of the Sussex Company stock, and received therefor shares in the Zinc Company stock to the same amount at the time of the consolidation."

Christian E. Detmold, a witness on the part of the Zinc Company, says, that he became connected with the Zinc Company in 1852, and was its president from the beginning of 1853 until the latter part of 1856. Being shown the agreement of September 4th, 1851, says, "I am perfectly familiar with that agreement. After that was made, an act of the legislature was obtained increasing the stock of the Zinc Company $600,000, making the entire capital $1,200,-000. Thereupon the stockholders of the Sussex Company surrendered their certificates of shares therein, and received in lieu thereof an equal amount of shares in the Zinc Company. I think there was $326,000 worth of new zinc stock issued in return for that amount of Sussex stock. The Sussex Company had originally $600,000 worth of stock in 48,000 shares, at $12.50 each; of that they had sold, prior to the amalgamation, 26,151 shares, and retained 21,849 shares, which latter were transferred to the Zinc Company by the Sussex Company, and the Zinc Company issued in lieu thereof, from time to time, their own stock to the same amount. The 26,151 shares of the Sussex Company, being in the hands of private stockholders, were surrendered by them to the Zinc Company, and in lieu thereof there was issued to them the like amount of the zinc stock. The Zinc Company received no other consideration for the stock which

they thus issued to the private stockholders of the Sussex Company but the Mine-hill property. The stockholders of the Sussex Company never paid any money for that stock. The price at which the stock of the Zinc Company was then selling was par and above par. I purchased at that time 1100 shares of them, and gave 12⅞, twelve dollars and fifty cents being par.

The Zinc Company recognized the agreement of the 4th of September, 1851, as binding, and acted accordingly. They recognized it, and carried it out in good faith, and the stockholders who received zinc stock for Sussex stock have fully participated in all the profits made by the Zinc Company ever since."

Mr. Aitkin, another witness for the Zinc Company, says, he has been president of the Zinc Company since December 12th, 1857, and has been a director since 1854; that before he became a director, all the 48,000 shares of the Sussex Company had been surrendered to the Zinc Company, and zinc stock had been issued therefor, with the exception of a few shares standing in the name of a person of unsound mind incapacitated to act, but that all the shares of the Sussex Company have equally participated in the dividends of the Zinc Company ever since he has been a director.

So that, according to the witnesses on both sides, in the spring of 1852, a year before it is alleged the Sussex Company got their name changed to that of the Franklinite Company, the Zinc Company had paid to the Sussex Company every dollar of their large amount of purchase money, either by actually issuing their own stock in exchange for that of the Sussex Company, or recognizing it as their own, and paying dividends on the whole.

What is the actual value of the consideration money thus given by the Zinc Company to the Sussex Company under this contract, and for which the Sussex Company were to transfer to them all their stock and all their property, real and personal? There were in the hands of the stockholders of the Sussex Company, in the spring of 1852, stock issued

to them to the amount of 26,151 shares, which, at $12.50 per share, amounted to $326,887. For this the Zinc Company issued to these stockholders their own certificates of consolidated stock to an equal amount, *viz.* $326,887. Mr. Detmold testified that the stock of the Zinc Company was selling at that time at par and above par; that he purchased at that time, and paid over par for $14,000 of the stock. To this I find no contradiction in the evidence. If this be true, the Zinc Company paid to the Sussex Company over $326,887 in actual value upon this agreement. The only other witness I find who speaks to this subject is Col. Curtis, a witness for the defendant, who says, that at the date of the agreement, September 4th, 1851, the stock of the companies was selling at from $6 to $6½ per share—so that, even taking this estimate, the Zinc Company must have given $163,443, or thereabouts, in actual value under this agreement. But Mr. Curtis was speaking of the value at the date of the agreement, September 4th, 1851, and Detmold, at the time of the consolidation, in the spring of 1852, which may account for the difference in their statement of value.

But this is not all the consideration the Zinc Company gave under and to perform this agreement. There were 21,849 shares of the Sussex Company stock unissued to individuals. These the Zinc Company also took and used under the agreement for the equal benefit of the stockholders of both companies. The effect of this was, that as long as the Zinc Company did not issue their increased stock to represent these 21,849 shares, those who received zinc stock in exchange for Sussex stock received so much larger dividends, and the original stockholders of the Zinc Company so much the less; and when sold, for every $100 got for them, those who had exchanged Sussex stock for zinc got $25, or thereabouts. Before the consolidation the Zinc Company declared dividends only on 48,000 shares, and after the consolidation on 96,000 shares; so that if they got nothing from the Sussex Company in exchange, as the Boston Company now contend for, they just sunk half their capital by the operation.

If the witnesses speak the truth, the Zinc Company must have given, in the performance of this agreement and as consideration money for this vein of ores, over $400,000 in actual value to the Sussex Company, or rather to their stockholders. At any rate, be it more or less, there is no dispute about this, that the Zinc Company performed, to the very letter and to the entire satisfaction of the Sussex Company, and of every one of its stockholders, the contract on their part to be performed. Not a whisper, through this large volume of 600 pages, has been lisped by any person or interest, or even on the argument, that the Zinc Company did not perform in the most strict and honorable manner the *whole* agreement on their part.

Having thus seen what was done by the Zinc Company in performance of this agreement and act on their part, let us now see what was done by the Sussex Company on their part to be performed. In the first place, the stockholders of the Sussex Company transferred or surrendered to the Zinc Company all their stock in the Sussex Company, amounting to 26,151 shares, and took that amount of the consolidated stock of the Zinc Company in exchange. In the second place, the Sussex Company transferred or surrendered to the Zinc Company all their stock, amounting to 21,849 shares, not yet issued to individuals, and the Zinc Company issued their own consolidated stock from time to time in lieu thereof, and applied its proceeds strictly according to the agreement for the equal benefit of the stockholders of both corporations. These facts are abundantly established by the evidence. Thus Major Farrington says: " After the conveyance of the property, the individual shareholders in the Sussex Company, in pursuance of the agreement, surrendered their stock certificates to the Zinc Company, and received a corresponding number of shares of the stock of that company. The stock which had not been issued by the Sussex Company was sold by the Zinc Company. The proceeds applied for the uses and benefits of that company (of course the consolidated company), and the act of union, as contemplated by the agree-

ment referred to, was perfectly and fully consummated.' Again he says, " after the act of the legislature, the shareholders of Sussex stock surrendered their certificates for those of the Zinc Company. In this manner the whole of the stock of the Sussex Company became converted into shares in the Zinc Company almost immediately, except about thirty shares, and and the whole of it ultimately. The agreement was finally carried out between the companies."

James L. Curtis, a witness for the defendant, says: "There was an agreement, in September, 1851, to transfer the property of the Sussex Company to the Zinc Company, which was carried into effect. The Sussex Company conveyed its rights to the Zinc Company. I held several thousand shares of the Sussex stock. I received therefor shares in the Zinc Company stock to the same amount at the time of the consolidation."

Mr. Detmold says: " The Sussex Company surrendered their certificate of shares therein, and received in lieu thereof an equal amount of shares in the Zinc Company. There was $326,000 worth of new zinc stock issued in return for that ·amount of Sussex Company stock. The Sussex Company had originally $600,000 worth of stock in 48,000 shares, at $12.50 each; of that they had sold, prior to the amalgamation, 26,151 shares, and retained 21,849 shares, which latter were transferred to the Zinc Company by the Sussex Company, and the Zinc Company issued from time to time their own stock in lieu thereof. The 26,151 shares of the Sussex stock, being in the hands of private stockholders, were surrendered by them to the Zinc Company, and in lieu thereof was issued to them the like amount of zinc stock. The Zinc Company received no other consideration for the stock which they thus issued to the private stockholders of the Sussex Company but the Mine-hill property. The stockholders of the Sussex Company never paid any money for that stock. The stock was then selling above par." It is admitted, on all sides, that the Zinc Company or its stockholders now hold, under the agreement of September 4th, 1851, and the

said act of 1852, every share of the 48,000 shares of the Sussex Company and every fraction of every share honestly, justly, and fairly, and that the Sussex Company and their stockholders have received every cent which was to be given them in return, amounting, as we have seen, to over $400,-000 in actual value upon what they are at this moment, and have been for the last ten years receiving their regular dividends equally with the original stockholders of the Zinc Company; that the Zinc Company and its stockholders so hold the shares of the Sussex Company so transferred under and precisely according to said agreement of September, 1851, and the act of 1852. There has never been the slightest intimation that a single share, or fraction of a share, was transferred to the Zinc Company, or is now held, under any misapprehension or mistake whatever. Under these circumstances, which of these parties, the Zinc Company or the Franklinite Company, is the owner in equity of this vein of ores? By the terms of said agreement, the Sussex Company agree to convey to the Zinc Company all their real and personal estate, and all mines, minerals, leases, and rights, and all their capital stock, and the Zinc Company agree to recognize and admit the whole stock of the Sussex Company to the same dividends as their own; they agree to get an act of the legislature to enable them to carry out such agreement. The Sussex Company, by the agreement, put the Zinc Company into present possession of this very vein of ores. Both parties, in pursuance of the agreement, apply to the legislature, and get an act enabling them to carry out such agreement. The Zinc Company perform the whole agreement on their part, and the Sussex Company and their stockholders pass over to the Zinc Company all their stock, and receive the stock of the Zinc Company in return In whom do these facts vest the equitable titles to all the property of the Sussex Company, including this vein of ores? Most clearly in the Zinc Company—and that from two considerations. In the first place, for a very valuable consideration, the Sussex Company, by the very terms of the agreement of 1851, agreed

to convey to the Zinc Company all their real estate, and put them into present possession of the same, and the Zinc Company paid, and the Sussex Company received the whole consideration money. Under these facts, the Sussex Company can only stand seized of the real estate to the use of the Zinc Company, and equity will protect such equitable estate and its enjoyment, and use even against the trustee, if he undertakes to use it adversely to the *cestui que use.*

In the second place, the Zinc Company hold all the stock of the Sussex Company rightly and justly, or its stockholders do. If the Sussex Company hold the legal title to the land, its stockholders hold the equitable title, and here all its stock has been assigned or transferred to the Zinc Company. The Zinc Company therefore, both by virtue of the agreement to sell and by virtue of its being the owners of all the stock of the Sussex Company, is in equity the owner of all its real estate, and entitled to its exclusive use. It is indifferent, therefore, in the present case, whether the Sussex Company owns the title or not, the complainants are entitled in equity to be protected in its use.

Let us now see upon what grounds the Franklinite Company attempt to get clear of this equitable title. The original stock of the Sussex Company was 600,000 shares, of $12.50 each. These have been all sold and surrendered to the Zinc Company; but the Franklinite Company contend, that after said act of 1852, two or three of their directors delayed transferring thirty shares out of the 48,000 until 26th January, 1863, when they got the legislature to pass an act, of which the following is a copy : " A further supplement to an act entitled, an act to incorporate the Sussex Zinc and Copper Mining and Manufacturing Company.

Be it enacted, that the name of the Sussex Zinc and Copper Mining and Manufacturing Company be and the same is hereby changed to that of the New Jersey Franklinite Company, and that said company be and is hereby authorized to increase its capital to $1,200,000, to be divided into shares of $12.50 each."

. Let us now see who got these certificates of new shares issued by the Zinc Company to the stockholders of the Sussex Company for their stock. There were 26,140 shares issued altogether by the Sussex Company to individuals. Of these, 20,000 shares were issued to Samuel Fowler, as consideration money for the deed of the 10th March, 1848, conveying this property to the Sussex Company. James L. Curtis swears that he also had several thousand shares, and Major Farrington, who was a director in both companies, perhaps held the balance. Curtis, Farrington, and Fowler were all of them directors in the Sussex Company when this stock was transferred, so that, by this arrangement, these three directors of the Sussex Company must have received, in the year of 1852, from the Zinc Company stock to the amount of about $326,000 in actual value. What did they do with the zinc stock they thus got in exchange for their Sussex stock? Farrington says his connection with the Zinc Company ceased in 1853. We find Curtis, early in 1853, out of the direction of the Zinc Company, and president of the Franklinite Company, and had, he said, a very large interest in that company. We also find Fowler a very large stockholder in the Franklinite Company very shortly after, and hear no more of his connection with the Zinc Company. We may therefore safely infer that, very shortly after they received this $400,000 in new zinc stock, they also parted with this new zinc stock, which thus passed to other *bona fide* purchasers, and who are part of the persons in real interest here now defending their rights thus acquired in the Zinc Company; and now these two or three directors, Curtis, Farrington, and Fowler, having thus put into their own pockets $400,000, thus derived from the Zinc Company, and having put upon the Zinc Company all the debts of the Sussex Company, and all its stockholders too, what do these three gentlemen do? We will tell it in their own language, for we should hardly believe it upon other evidence. Major Farrington tells us in the most innocent manner, as if he could see nothing unusual or wrong about it, that after the act of the 12th of February, 1852, authorizing the consolidation of the

Sussex and Zinc corporations, that all the shareholders hold-
ing certificates of Sussex Company stock surrendered their
certificates for those of the Zinc Company.  In this manner
the whole of the stock of the Sussex Company became con-
verted to shares of the Zinc Company almost immediately,
except about thirty shares, and the whole of it ultimately.

Several of us, who were in the board of directors of the
Sussex Company *delayed* transferring over these *thirty* shares
to the Zinc Company *for the purpose of delaying an organ-
ization of the Sussex Company until the action of the* legisla-
ture could be had by which the *Franklinite Company was
formed,* and that, at the next session of the legislature, *we*
(that is these two or three directors) *applied for a supple-
ment to the charter of the Sussex Company,* which was
granted; and among its provisions was one changing the
name of the Sussex Zinc Company to that of the Franklinite
Company, which was immediately organized after the pas-
sage of the act.

Now these two or three directors seize upon all these
48,000 shares of additional stock authorized as we have seen
by the said act, and under and by virtue of it, are now
claiming in a court of equity to hold all the property which
the Sussex Company had agreed to convey to the Zinc Com-
pany, and for which the latter company had paid every dol-
lar of consideration money.  Can we conceive a more gigan-
tic fraud than is thus attempted to be practised by these two
or three directors under this act of the legislature?  They
pocket from the Zinc Company several hundred thousand
dollars, under an agreement to transfer to the Zinc Company
all the stock and all the property of the Sussex Company,
and they do actually pass over to them the whole 48,000
shares of the original stock of the Sussex Company, but
delay transferring about thirty shares thereof for a short
time for the purpose, as they imagine, of keeping the Sussex
Company alive until the next session of the legislature.
These two or three directors then get an act changing the
name of the Sussex Company to that of the Franklinite Com-

pany. Having then no further use for the thirty shares, they then pass them over, too, to the Zinc Company at the agreed price. Then seizing upon the whole 48,000 shares of increased stock, upon an allegation that the legal title to the land owned by the old Sussex Company had not been legally transferred under the agreement of 1851 and the said act of 1852, claim to own again all the old property of the Sussex Company, and are now actually here pressing us, sitting as a court of equity, to protect them in its use.

Little could the Zinc Company imagine the innumerable woes lurking under this apparently accidental delay in transferring only thirty shares out of 48,000,—little could they dream that in the scientific alembic of Major Farrington's brain this innocent delay should work such magic results as to deprive them of all their stock represented. Before the Sussex Company got their name changed to that of the Franklinite Company, all its stock, 48,000 shares, belonged, in law and equity, to the Zinc Company. This all parties contend for and admit. This the Franklinite Company contend for as well as the Zinc Company. The Franklinite Company repudiate, equally with the Zinc Company, that the old stock of the Sussex Company, transferred as aforesaid, had any vitality after the transfer. The very corporate existence of the Franklinite Company is based upon that idea. The Franklinite Company claim to own this vein of mixed ores, not under the old stock, but under the new. I repeat that, on the 26th January, 1853, the old $600,000 of the Sussex Company's stock (if the Sussex Company had not ceased to exist by virtue of the execution of the agreement of September 4th, 1851,) belonged to the Zinc Company. But on that day the legislature changed the name of the Sussex Company to that of the Franklinite Company, and *presto* it is claimed that the property represented by this $600,000 of old stock which belonged to the Zinc Company the moment before, belonged to the Franklinite Company the moment after. Thus by a stroke of the pen, in an instant, without consideration, without even saying by your

leave, taking $600,000 out of the pockets of the Zinc Company, and putting it into the pockets of the two or three directors, who delayed a little while transferring thirty shares out of 48,000, so as to have time to accomplish it, these two or three directors sell property, and get two or three hundred thousand dollars cash value in hand for it—thus change their name, and it is all back again.    This beats anything in the Arabian tales.    It obscures the Alchemist—no such pocket as this was ever discovered in California.    It was the easiest way of making $600,000 I have ever heard of.    It was not to be expected that so successful a financial achievement should rest satisfied with one operation.    It was a lead too promising not to follow; accordingly we find that this new Franklinite Company soon had a very numerous progeny.    These companies immediately and rapidly increased, branching off from each other like gamblers at *vingt-une*. The pamphlet laws of those years are plethoric with their charters, and in which these same two or three directors are the *dii majores*.    Mr. Fowler says that he alone had stock in no less than fifteen of them, and he don't know how many more, *viz.* the Passaic Company, the Fowler Franklinite Company, the Union Exploring Company, the Franklinite Steel Company, the National Paint Company, the Sparta Iron Company, the Consolidated Franklinite Company, the Triunion Company, the New York Franklinite Company, and we hear of others through this large volume of testimony, none of them having less than $600,000 of capital stock, and most of them over a million.    What oceans of money they made no one can tell.    All this while this Zinc Company pursued its plodding way, building oven after oven, furnace after furnace, and factory after factory, expending in such improvements, upon the faith of this transfer of stock, over $300,000, besides the very large consideration money it had paid, forcing success along the hard road of industry, developing, according to the true intent of its charter, the ore of zinc, manufacturing that pure snow-white paint for the calls of commerce and comfort, convenience and elegance of life.

The New Jersey Zinc Co. *v.* The Boston Franklinite Co.

They were the workers in the hive—they were the silk-worms painfully weaving their shrouds of silken thread, while this Franklinite Company toils not, neither does it spin—not an ounce of its boasted franklinite has it ever yet yielded to the demands of commerce. It springs at once into the butterfly stage of its existence, whose only object in life is to spread its golden wings to the glittering sunshine and multiply its worthless species. I conclude that this act of the legislature, changing the name of the Sussex Company to that of the Franklinite Company, and adding another $600,000 to its stock, however it may continue down to the Franklinite Company any scintilla of legal title remaining in the old Sussex Company, cannot alter the condition of the questions of equitable right—that the broad fact still remains, that before this act was passed the Sussex Company had agreed to sell the vein in question to the Zinc Company, had received the whole consideration money, had transferred to the vendee all its stock and put him in possession, and if it had not transferred all its legal title, it ought so to have done, and equity will treat it as if it had.

Nor can the Franklinite Company claim any rights, legal or equitable, in the old property of the Sussex Company by virtue of the increased stock. The Franklinite Company must say, either that they are the old Sussex corporation or a new corporation. If they are a new corporation, then they can have no rights whatever in the old stock or the property of the old company—they are neither its devisee or its heir. But suppose the Franklinite Company are, as they claim to be, the old Sussex corporation under a new name, there are some legal consequences which I apprehend the Franklinite Company have not entirely digested.

If the Franklinite corporation is the old one under a new name, who are its stockholders—and of the increased stock, as well as the old, how did the individuals who have been pretending to deal in it get it? Before the name was changed or stock increased all the stock of the corporation belonged to the Zinc Company or its stockholders. To whom did the increased

stock belong? Clearly to those who owned the old stock by virtue of their old stock. It follows, as a consequence, that at this day the Zinc Company owns every dollar of the stock of the Franklinite Company, and are as such entitled, in equity, not only to all the real and personal estate still belonging in law or equity to the old Sussex Company, but also to all the property of the Franklinite Company since acquired, from whatever source, upon the principle, that the owners of the stock of a corporation are, in equity, the owners of all its property. And if we have only the Sussex Company by a new name before us, under the agreement of 1851, and the transfer of all its stock, the Zinc Company, in equity, own not only this vein, but all the other property now claimed by the Franklinite Company, and that whether it gets title under the Fowler deed of 1848 or under the Curtis deed of 1850 and 1853, or however otherwise. It is not the Franklinite Company who will own in equity the old property by virtue of its new stock, but the Zinc Company now will own the new property by virtue of the old stock.

I conclude that not only does the Franklinite Company fail to prove any right in equity to the use of this vein, but that the proof shows affirmatively that it is in the Zinc Company, and that such right ought to be protected in equity, even if there is a legal title in the Franklinite Company.

But does the proof show any such legal title? This we will now proceed to examine. The Franklinite Company, in claiming title to this vein of ores through the Fowler deed of 1848, can only do it as being the old Sussex Company under a new name. If they are a new corporation as to this property in dispute, they clearly show no legal title to it. They show no deed, no consideration paid, no agreement to transfer. They only show the act changing the name, and as such cannot be either the heir or devisee of the Sussex Company. That the Franklinite Company, as to this vein of ores, is a new corporation, and not the old Sussex corporation under a new name, has been substantially already adjudicated at the solicitation of both parties.

After the act creating the Franklinite Company in 1853, the Franklinite Company waited formally upon the Zinc Company, and demanded of them the old charter ; the Zinc Company demurred, and it was finally left to Judge Kent, who decided that the Zinc Company had no claim on the charter, and in consequence thereof, on the 25th of October, 1853, the Zinc Company resolved as follows : " that the Zinc Company acknowledges that it has no claim of any kind or description on the charter of the New Jersey Franklinite Company or to any of the privileges thereby conferred, and that the president of this company is hereby authorized to furnish a certified copy of this resolution to the president of the Franklinite Company." It is perfectly apparent upon what grounds Judge Kent must have proceeded; for if he had not thought that the Franklinite Company, as to the old property of the Sussex Company, was a new corporation, the Zinc Company, instead of having no claim on the charter of the old Sussex Company, would be the only party that had. But if the Franklinite Company, as to the old property, was a new corporation, then as clearly they had not. Judge Kent must therefore have looked upon the action of the legislature of 1853 as creating a new corporation in rather a novel way, whose directors and powers were defined by the original Sussex charter, and that therefore the Franklinite Company had an interest in the old charter, and that the Zinc Company had not. And the same is implied by the language of the resolution, which disclaims, on the part of the Zinc Company, all interest not in the Sussex charter, but in the charter of the New Jersey Franklinite Company.

I am of opinion that the Franklinite corporation, as regards the Zinc Company and the old property and stock of the Sussex Company, are a new corporation, and have no legal title, and have and hold none of the legal rights of property that belonged to the Sussex Company. The Franklinite Company have in every respect acted like a new corporation. They treated the increased stock as the stock of a new corporation ; they bought other lands, and went into

2 o*

business as a new corporation under its new stock—not a single share of the old stock has ever been represented in any of its proceedings or voted upon for any of its officers. The only solitary act in ten years that the Franklinite Company has done, otherwise than as a new corporation, is this claim to own the old property under its new stock. The Zinc Company, having been put in possession by the old Sussex Company, and the Franklinite Company showing no legal title, surely have no right at law or in equity to disturb the Zinc Company in the use of the property in dispute.

But there is still another difficulty in the legal title of the Franklinite Company to this vein of ores. On the 8th of March, 1852, a year before this Franklinite Company was formed, the Sussex Company made to the Zinc Company a deed, in which the property intended to be conveyed is described as follows: do grant, &c., " all the zinc and other ores, except franklinite and iron ores found or to be found in, on, or upon the following described premises, that is to say, that certain farm, situate in the township of Hardyston, Sussex, New Jersey, consisting of several contiguous tracts: first, the Mine-hill farm, consisting of 93.16 acres, butted and bounded as follows: beginning," &c., and describing it by metes and bounds; and after doing so, proceeds in the following words: " together with all and singular the tenements, hereditaments, and appurtenances thereunto belonging or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues, and profits thereof; and also all the estate, right, title, interest, property, claim, and demand whatsoever, as well in law as in equity, of the said parties of the first part of, in, and to the above described premises, and every part and parcel thereof, with the appurtenances, to have and to hold," &c. There may be, perhaps, in this description one latent and two patent ambiguities. The first patent ambiguity may be caused by the words " all the zinc and other ores, except franklinite." Are we to read this as if the language were, all the zinc except the franklinite, or as if it were all the

other ores except the franklinite. My opinion is that the latter is the true construction, and that the franklinite is to be excepted from the other ores, and not from the zinc, that the zinc ores are to be conveyed and all the other ores except franklinite and iron ores.

The other patent ambiguity originates in the words, " and also all the estate, &c., of the parties, &c., of, in, and to the above described premises." Do the words, " above described premises " refer to the words in the first of the description, all the zinc and other ores, or to the premises described by metes and bounds? I am of the opinion that they refer to the latter. We are not inquiring as to the effect of these words if they had been inserted in the *habendum* clause, but as to what is their legal effect when used as words describing the property conveyed. The language used here has precisely the same legal effect as if the description had read, " all the zinc and other ores found in, also all the estate of the parties of the first part of, in, and to the following described premises, that is to say," &c., and then describing it by metes and bounds. The deed, upon the face of it, was evidently intended to convey not only the zinc ores, but also all the estate the grantors had in the premises described—clearly as much so as if the deed had omitted the words zinc ores, and had merely said, we convey all our right and title to the premises, butted and bounded as follows.

The result of this conclusion is, that as both parties have claims under the Sussex Company, and so admit that the Sussex Company owned this vein of ores in dispute, I say the result is, that this vein in dispute passed by the very terms of this deed to the Zinc Company. It has been argued that this construction would destroy the exception. I do not see how. The exception would have been there quite as appropriately if the grantors did not claim to own the franklinite at all, and which, by the way, the case shows they did not claim to own, for they bought it afterwards of James L. Curtis and his brother. It is also argued that this construction would operate to pass the absolute fee in the land itself. But not so

if they did not own it, and that they did not pretend to; and if they did, and used that language, it ought to pass, unless they alleged some mistake or misapprehension, which is not pretended. It is also argued that these terms, if used in the *habendum* clause, are limited to mean the thing granted. This is admitted. But it so happens that these terms here are *not* in the *habendum* clause, but in the clauses describing the property conveyed, and by the terms of the deed this right and estate of the grantors is as much the thing granted as the ores themselves. The things granted here are the ores and the grantor's estate in the premises described by metes and bounds. The words are not used to alter or enlarge the extent of the grant, but it is the very thing itse'f granted.

If we are right in this construction of the deed, it is very evident that the Franklinite Company have not a scintilla of legal or equitable rights.

But as the decree below proceeds upon the finding that the evidence shows that at the execution of the deed the parties thereto understood that this vein in question was not a zinc, but a franklinite ore, and so excepted from the deed; and as that question was very forcibly and earnestly argued at the hearing, we will proceed to examine that question more at large.

The Zinc Company contend that, by the term zinc ores in this deed, both parties intended this vein of ores. The Franklinite Company contend that they did not; that this vein is not a zinc, but a franklinite ore, and so was intended to be excepted. This is a latent ambiguity, and only to be solved by the evidence, and the object of the evidence is to ascertain the meaning attached by the parties to the words used at the time of the execution of the deed. But how are we to ascertain this meaning?

The most certain way of fixing the meaning of the terms of description used in a deed was the old common law practice of livery of seizin. In this case, if the parties had gone upon the mass of ore in *situ* and made livery, by whatever name they might have called it, the identical mass of ore would

have passed. The parties would have demonstrated on the ground what thing they meant by the term "zinc ores," as if a man takes a horse by the bridle, and says, I sell you this cow, and delivers the article, the horse would pass. But when the conveyance is by deed of bargain and sale, and the thing sold is only designated by arbitrary signs, the only way to ascertain the mind of the parties is to attach the sign to the thing sold in the best way possible; and when there is any doubt what thing the sign stands for, it is necessarily a matter of proof, and the thing to determine is the weight of the evidence.

What, then, was meant by the parties at the time they used the term zinc ores in this deed? Did they mean this vein in dispute? The Zinc Company say they did—the Franklinite Company say they did not. They say that this vein was not a zinc ore at all, but a franklinite ore and not a zinc ore, and that instead of intending to convey this as a zinc ore, they intended to except it as a franklinite ore. In ascertaining this intent, I shall first call attention to the condition of the property at the time of the execution of the deed.

The evidence establishes beyond dispute that if this vein in dispute is not a zinc ore there is no zinc ore on the property at all, and that both parties must have perfectly well known at the execution of the deed. It is also perfectly well established, by the evidence, that if this vein is not a zinc ore, that there are no ores on the property but iron ores, including this franklinite, a species of iron ore, and which all parties also perfectly well knew. The evidence also shows that this vein had been known and worked for a century as an ore yielding a large per centage of metallic zinc, and from which the zinc for the United States standard weights and measures was obtained.

The evidence also shows that there were no other ores on the premises except this vein of franklinite and iron ores, and all parties well knew it. Now, may we not ask, if it was not the intention to convey this vein by the name of a zinc

ore, what did the parties intend to convey? It is apparent, that if they did not intend to convey this vein by the name of a zinc ore, it must have been the intent of both parties to convey nothing. I think these facts show that it must have been the intent to convey this vein by the name of a zinc ore, for there is nothing else upon which the deed could operate, and both parties must have known it. There is nothing upon this property but this vein of franklinite and iron ore. The franklinite and iron ores are excepted in terms, and if this vein was meant to be excepted as franklinite the deed conveys nothing, as both parties must have known. Under these circumstances, we can draw no other conclusion than that the parties meant to convey something by the deed, and that could only, as both parties must have known, have been the vein in question. That the parties must have intended to convey this vein as a zinc ore, and not make a deed that conveyed nothing, is further proved by the consideration given. The Zinc Company had a capital of $600,000, divided into 48,000 shares, and which were then selling at about par. This capital stock was then doubled, and they gave the whole of their increased capital for this deed. Now are we to believe that the Zinc Company would give, and the Franklinite Company take 48,000 shares of the Zinc Company stock for a deed which both parties must have known conveyed nothing? We can only conceive this upon the supposition that both parties thought that this vein was passed by the deed under the name of zinc.

But again: it is manifest, from the evidence, that the vein of ores was owned by the grantor, and that it was the only thing he did own in the premises. As the grantor got this large consideration, must it not have been the intent to convey the thing he owned? Can we believe he intended to convey something he did not own? Must it not, therefore, have been the intent of the parties to convey this vein under the name of zinc? Another evidence that this vein was intended by the parties to pass under the name of zinc, is that

in all other deeds, ancient and modern, this vein has been
passed and repassed, reserved and re-reserved, under the
name of a zinc ore, and this deed now in controversy is the
first one where it was ever pretended that it did not pass by
that name.  Thus, in the deed from Doct. Fowler and his as-
signees, the deed conveys all the zinc and iron ores in Mine-
hill.  Now, in all the ancient deeds, of what material thing
was the word zinc a sign?  There is no such word as frank-
linite in any of them until this deed of Fowler in 1848.  In
all the ancient deeds, does not the word zinc stand as a sign
for this vein in dispute?  It will be remembered that Far-
rington, the main witness for the Franklinite Company, says:
"There are the remains of several old pits along the line of
the vein, some of which look as though they might have been
made one hundred years ago."  Now, where we find the an-
cient as well as the modern deeds conveying the zinc and
iron ores, is it not apparent that by the zinc ores they
mean this vein?  How does it happen that, if this vein had
ever been known not as a zinc vein, but only as a franklinite
ore, it is never so called in any deed, ancient or modern?  If
there was no zinc in the Mine-hill, how does it happen that
the deeds are always professing to convey all the zinc ores,
and say nothing about franklinite?  On the 15th February,
1845, Oaks Ames made a deed to Cyrus Alger, under whom
Samuel Fowler held, as follows: "in consideration of $2500,
I bargain and sell to Cyrus Alger the one undivided half
part of all the zinc and other ores and minerals on or within
any of the lands owned by Samuel Fowler, excepting iron
ores when unencumbered with zinc and other metals."  The
Franklinite Company claim the vein in question under this
deed, and yet the word franklinite is not in the deed.  Now,
as this vein was the only one of value except iron ore un-
combined with zinc, it is passing strange that if this vein was
then known as a franklinite, and not as a zinc vein, the only
thing that was intended to be conveyed was not even named,
while all the terms employed relate to zinc ores, of which,
if this vein was not intended to be passed as zinc ore, both

parties knew there was not a particle on the property.    This deed proves that up to 1845, no one, in dealing with this vein as an article of sale or purchase, ever thought of calling it a franklinite ore, for the very obvious reason, that this franklinite mineral was entirely worthless.    The vein was only valuable for the zinc that was in it.

Let us now examine this deed of 1848, and see if Fowler himself does not, in this very deed, convey this vein to the Sussex Company under the name of zinc, and not under the name of franklinite.    Chancery has found that this deed did convey this vein, and I entirely agree both with its reasoning and its result.    The language of this deed is " do bargain," &c., " all the zinc, copper, lead, silver, and gold ores, and also all other metals and ores containing metals (except the metal or ore called franklinite and iron ores, where it exists separate from the zinc) existing, found, or to be found on that certain farm," &c.    This vein passed, if it passed at all, by the force of the words of grant, and not by the force of the words of exception.    With respect to this deed, the Franklinite Company take contradictory positions.    They first contend that this deed of 1848 does not convey this vein to the Sussex Company at all, and in the second place they contend that it did pass it, but that it never has been passed by deed from the Sussex Company to the Zinc Company, but still remains in the Franklinite Company, as being the old Sussex Company under another name.    I shall first consider the position taken by the Franklinite Company, that this vein did not pass at all by this deed of 1848 from Fowler to the Sussex Company.    Upon this point the Franklinite Company contend that, as regards the words " except the metal or ore called franklinite and iron ores, where it exists separate from the zinc, that the words " where it exists separate from the zinc" apply only to the words " iron ores," and not to the word " franklinite," and that the vein in question is a franklinite ore, and not a zinc ore, and that the vein is consequently excepted from the grant under the name of franklinite.    But the evidence clearly shows that at the date of

this deed all parties perfectly well knew that the only ores or metals in this Mine-hill were zinc, franklinite, and iron ores, and that if this vein was not a zinc vein of ores there was no zinc on the premises; and as the franklinite and iron ores are excepted in terms, it follows, under this construction, that the deed conveyed nothing. The deed shows that the Sussex Company gave 20,000 shares of stock, which at its par value was $250,000, for this deed. It is therefore utterly impossible to believe that the Sussex Company could give this large price for a deed which they must have known conveyed nothing. The only possible way to explain it is, that this vein was regarded on all hands as a zinc vein, and passed under the deed by the name of zinc.

Taking the franklinite construction of the deed as the true one, it leaves in this deed of 1848 the same latent ambiguity as in the one of 1852, *viz.* what is meant by the term zinc ores in the words of grant, and by which the evidence shows the parties must have intended this vein of ores. But the latent ambiguity in the deed of 1848 is cleared up by further description. By the true construction of the deed of 1848, the words, "when it exists separate from the zinc," applies to the franklinite, it only excepts franklinite which exists separate from zinc, and of course conveys franklinite when it is not separate from the zinc, and as the proof shows this vein is here mixed mechanically with franklinite, it all passes. That this deed of 1848 passes this vein with the franklinite mixed with it is manifest from many considerations. In the first place, it is the true legal construction of the language of description. This is, " all the zinc and other ores, except the metal or ore called franklinite and iron ores, where it exists separate from the zinc." This is the first deed in which the word franklinite was ever used. In all previous deeds this franklinite had always been conveyed under the name either of zinc or an iron ore. Franklinite was not properly either a metal or an ore; it was zinc and iron in chemical combination, and thus could no more be an ore of franklinite than there could be an ore of brass.

The draftsman of this deed of 1848, when he came to make this exception, was in doubt what precise terms to use; he was in doubt which precise effect would be given to the term franklinite, as it never before had been used in any deed. It had always before, when existing separate from zinc, and when not regarded merely as a dross mixed with the zinc, been regarded as an iron ore, and is so treated and claimed by the Franklinite Company in all their proceedings. He therefore, in this exception, calls it by both names, *viz.* " excepting the ore or metal called franklinite and iron ores," having the word " called" understood before the word "iron" as well as before the word " franklinite," inadvertently using the plural of ore, by reason of its immediately following the two words, " franklinite and iron." There was only one thing meant to be excepted, and that was the thing called both franklinite and iron ore, and that only when it existed separate from the zinc. If it had been intended to except two things, *viz.* a thing that was called franklinite and a different thing that was called iron ore, the language would not be what it is, but it would naturally have been as follows, *viz.* excepting the metal or ore called franklinite, and also excepting the iron ores when they exist separate from the zinc. This is further manifest from the word " it" following the word "iron ores." We can only account for the use of the word " it" in that connection by the supposition that the writer intended to except one thing, *viz.* something that was called indifferently franklinite or iron ore. If it had been intended to apply the words, when separate from zinc and iron ores, the language would have been when " they," (not " it,") exist separate from the zinc. But suppose we change the word " it" into " they" the construction would still be the same. The language of the deed would be, except all the ores called franklinite and iron ores where they exist separate from the zinc. But that it was intended by the parties to except the franklinite where it exists separate from the zinc is perfectly manifest from the *habendum* clause. This is as follows: " to have and to hold all and every the zinc,

&c., and other metals and ores, excepting the one called franklinite, when it exists in a separate and distinct state from the zinc."

I do not see what possible ambiguity can remain in the exception in the words of grant after reading the exception as defined and emphasized in the *habendum;* and as the proof amply shows that what franklinite there is in the vein is not separate from zinc, but, on the contrary, so intimately mixed mechanically with the zinc as that it cannot be separated from it, it cannot be that the parties did not intend to convey this vein under the name of either of zinc or " other ores or metals." But I go further—not only does the deed of 1848 convey this vein by its terms, but it conveys it by the name of zinc ore. As what passes must be of grant, and not by force of the words of exception, the vein must pass either by force of the words " all zinc ores" or by force of the words "all other ores." The Franklinite Company contend that this vein was called a franklinite vein, and that it passes therefore under the words " other ores," which would comprehend franklinite. The exception shows that it was not intended to convey all the franklinite, but only the franklinite ores mixed with the zinc ores. Taking the words of grant and of exception together, it is the same in legal effect as if it had read, we sell, &c., all the zinc ore and all the franklinite ore mixed with the zinc ore. Now the vein would not pass simply by the words franklinite ore mixed or not separated from the zinc ore. That would only pass the franklinite portion of it, leaving the title to the zinc part of the ore in Fowler. The zinc part of the vein must necessarily, therefore, have passed by force of the words, " all the zinc ore;" so that it must have been the intent of the parties in this deed of 1848 to have conveyed at least the zinc portion of this vein under the name of zinc ore, and not under the name of a franklinite ore.

Again : the whole object of this deed of 1848 was to convey this vein. It was the only thing Fowler owned in the premises, and was the only thing there of any value. If the vein had

been understood and called by the parties a franklinite, and not a zinc ore, how did it happen that the term franklinite is not used in the words of grant? The deed uses the words, all the zinc, copper, silver, and gold ores—of which the defendants say there was none, not even zinc, and the only thing they say was there, *viz.* franklinite ore, is not in the words of the grant·at all. We can only answer for this upon the supposition that at the time all parties understood this vein to be a vein of zinc ore, and that the worthless franklinite passed with it as its dross, and the object of the exception was to prevent franklinite, when separate and distinct from the zinc ore, from passing under the name of other ores.

But again : by whatever name this vein may have gone by among men of science, it was not conveyed in this deed of 1848, nor had it ever before been conveyed by any deed, ancient or modern, under the name of· franklinite. But there are many other considerations, considering the words zinc and franklinite as latent ambiguities, which go to show that this vein was intended to be conveyed in this deed of 1848 under the name of zinc ore. Major Farrington, the main witness of the Franklinite Company, and who, by his interference with the deed of 1852, made this whole controversy, says " the Sussex Company was an organization under a charter formed for the purpose of manufacturing zinc from ores obtained in Sussex county. They purchased zinc ores upon Mine-hill." Now, as there is no pretence that they ever acquired any zinc ore except this vein, they must have got it by virtue of this deed of 1848, under the term zinc ore, in that deed. Again, the very title of the act of this Sussex Company was the Sussex Zinc Mining and Manufacturing Company. They wanted zinc, not franklinite ore,—nay more, as soon as they got this deed they went immediately into possession and at work upon this vein as a zinc ore, mined several hundred tons, but did not pursue it long, not because there was not plenty of zinc ore in it, but because it was not in the form of a red oxide. So that it is perfectly manifest that in this very deed of 1848, under which all these parties claim this

vein, was bought and sold, in consideration of $25,000, under the name of a zinc, and not a franklinite ore.

But there is another curious cotemporary fact showing that this deed of 1848 conveyed this vein under the name of zinc. At the same time that Fowler made this deed we have spoken of he made another deed, without any consideration, to the Sussex Company for all the franklinite specially by name, on a portion of the very premises described in said deed of 1848. The language of this last deed is, " all the metal, mineral, or iron ore usually known and designated by the name of franklinite, found or to be found on, upon, or in a certain tract of land," going on and describing a part of the very premises described in the deed conveying the zinc ore. Samuel Fowler, one of the other main witnesses for the Franklinite Company, being asked, " after you conveyed the zinc and other ores to the Sussex Company by the deed of the 10th March, 1848, did you make a separate conveyance to that company of franklinite," answers, " after I agreed to convey the zinc ore to the company, I agreed to convey, and did convey, in March, 1848, the franklinite ore on a piece of the land on Mine-hill farm ;" so that, by the testimony of the very man who made this deed under whom all parties claim, says that he made the first deed to convey zinc ore, and the later deed to convey franklinite ore—must he not therefore have intended to convey, and did he not actually convey this vein in the first deed by the name of zinc ? Why, if the parties then had regarded this vein as franklinite, and not zinc, what was the object of making the second deed ? They got all the franklinite by the first deed. By the theory of the defence, this vein is franklinite, and not zinc, and the second deed had nothing to operate on. These facts conclusively show that the object of Fowler's first deed was to convey to the Sussex Company this vein under the name of zinc ore, and to convey by the second deed franklinite not so mixed with zinc as to pass under the name of zinc ore. But not only is this vein passed as a zinc ore in this deed of 1848, but again it so passed to Fowler in the deed from Alger in 1849. But not only so,

2 P*

it is so conveyed and confirmed again in Fowler's deed of confirmation in 1849. But again, not only do all the ancient and modern deeds show that this vein was called a zinc ore, and not a franklinite ore, but all the previous charters obtained from the legislature look the same way. All these charters, and there were several of them, up to 1853, recognise this vein as a zinc ore, and it was not until the Sussex Company had conveyed to the Zinc Company, for the large consideration we have named, all their zinc property, that these ingenious gentlemen, who got up all these recent charters, bethought themselves that by playing upon this word franklinite, by substituting for the name which the vein had gone by when spoken of as a subject of bargain and sale, the name by what men of science had originally designated this species of this mineral franklinite, they could start through the air all these beautiful and variegated bubbles, the success of their ascent being in proportion to their nothingness.

What right have we, then, when we find that in all the ancient and modern deeds, in all the old charters, this vein is conveyed by the name of zinc, to say that in this deed of 1852 it was not also conveyed to the Zinc Company under the same name? But these by no means exhaust the evidence that it was the intent of the parties to convey, by this deed of 1852, to the Zinc Company this vein of ores under the name of zinc. All parties connected with these transactions, the complainants as well as the defendants, the vendors as well as the purchasers, the mortgagees as well as the mortgagors and encumbrancers, in all the deeds they have made, in all the agreements they have entered into, in all the sales they have made, in every bushel of ore they have dug, in every pound of zinc they have extracted, in every certificate of stock they have issued, in all their acts of every description they have done from the granting of the charter of 1848, have always dealt with and treated this vein as a mass of zinc ore in *situ*. The Sussex Company was chartered to manufacture zinc, not iron —its chartered name was a Zinc Company—it sought to buy,

by the deed of 1848, a mass of zinc ore in *situ* for its chartered purposes. Under the deed, they took immediate possession of the vein with the full knowledge and consent of the vendor, and commenced to extract the ore as a zinc ore, and continued so to do until they discovered that the red oxide of zinc on Stirling-hill could be, in the then condition of the manufacture, somewhat more economically worked. They issued over $300,000 of stock, under the representation that they owned this vein as a mass of zinc ore in *situ*. Let us particularize some of these acts. Thus, on the agreement of 4th September, 1851, it was agreed between the Sussex Company and the Zinc Company that they would both apply to the legislature to obtain an act authorizing the Sussex Company to transfer all their property to the Zinc Company; and in pursuance of that agreement, both parties did so apply, and represented to the legislature that the Sussex Company, the owner of certain zinc mines in Sussex, and it is so recited in the preamble to the act. Yet the only property the Sussex Company owned was what they bought from Fowler in the deed of 1848, the only zinc on the premises was this vein, as all parties perfectly well knew. In this application to the legislature, upon which that act was founded, and which act is the foundation of all proceedings since, this very Franklinite Company must have represented to the legislature that this vein was a zinc, and not a franklinite vein, and procured the passage of the act upon that very representation. Again, in the answer of the Franklinite Company, they say that the intention of this deed of 1852 was to enable the Zinc Company " to develop the metals of zinc ores." Now how could that be the object, unless it was the intention, by the deed of 1852, to convey this vein, for that was all and the only zinc property they owned. Again, the Franklinite Company say, in their answer, that after said deed of 1852, they bought of Fowler the franklinite ores, or a portion of Mine-hill, to develop the metals of the franklinite ore ; so that, if we can believe their own answer, they must have intended to pass this vein under the deed of 1852 under the

name of zinc, thus could not have intended to retain this vein under the exception of franklinite, for they expressly state, in their answer, that they afterwards bought that from Fowler, and their answer, so far as it states otherwise, contradicts itself.

But again: if there is anything that stands out in bold relief in this cause, it is that it was the intention of the deed of 1852 to convey to the Zinc Company *all* the property of the Sussex Company. This is proved by the agreement of 1851, by the act of the legislature of 1852, by the evidence of all the witnesses on both sides, by the actual transfer of all the stock of the Sussex Company, both that held by individuals and that by the corporation, and by the universal admission at this day, that every share of that stock is now rightly held by the Zinc Company. If this be so, it could not be otherwise than that the deed of 1852 passed, and was intended to pass this vein under the name of zinc, the only possible escape for the Franklinite Company is to say that they themselves got no title for the vein by the deed of 1848 from Fowler.

But we have already shown that this vein did pass to them under that deed. Thus we might go on, if time permitted, that always, in every possible way and from the parties to the deed of 1852, acted, spoke, and treated this vein as passing by this said deed under the name of zinc ore. But it is said, in behalf of the Franklinite Company, that the deed of 1852 differs from the deed of 1848 in this, that the deed of 1848 conveys " all the zinc and other ores, except franklinite ore, when it exists separate from the zinc," and the deed of 1852 leaves out the words "where it exists separate from the zinc;" and it is therein argued that the deed of 1848 conveys the vein under the words other ores, and the deed of 1852 excepts it under the name of franklinite. This should be very manifest before the court should so hold; for if that be so, as this vein was all the property the Sussex Company owned, the deed of 1852 conveyed nothing, and both parties must have known it. The construction of the deed should be most

strongly against the grantor. And we have shown that the intent not to convey this vein could not consist with the avowed intent of the deed of 1852 to convey *all* the property of the Sussex Company.

But independently of all the considerations I have named, let us see what this suggestion amounts to. The Franklinite Company must satisfy us, first, that when the deed of 1852 was executed, that the parties thereto understood that this vein was not a zinc ore, but a franklinite ore, and intended to except it under the latter name. But this they are estopped from doing by the avowed object of the deed and the proof of all the witnesses that it was the intent to convey all their property.

But we are asked, if the change in the deed of 1852 had not the object to reserve the vein under the name of franklinite, what was its object. We answer, in the first place, that is not the business of the Zinc Company; they are grantees, and it is for the other side to manifest their exception. But if it was the duty of the Zinc Company, it is entirely explained by the evidence of the main witness of the Franklinite Company, Major Farrington. This witness says all things went on according to the agreement of 1851; the act was procured, the stock all passed over, the deed drawn to convey all the property to the Zinc Company; and he and all the other witnesses expressly swear that the agreement of 1851 was carried out. He then explains how this alteration in the language of the description of the deed in 1852 happened. He and all the witnesses say it was not to convey less than the whole property, but he states here how it happened. He says the deed was first drawn in the precise language of the deed of 1848. Both boards of directors met, all parties were satisfied with it, and they were about to execute it when he suggested a scientific doubt. Franklinite is a mineral which is composed of zinc and iron in chemical combination, and Farrington suggested that, as franklinite, in *rerum natura,* could not exist chemically separate from zinc, that therefore the phrase in the deed of 1848, " except franklinite

where it exists separate from zinc," would embrace franklinite mechanically separate from zinc; and the deed was altered not to prevent the passing of all the property of the Sussex Company, but to prevent its being construed to pass franklinite when not mechanically mixed with zinc and when zinc was only present as a chemical constituent of franklinite. The deed was altered with that view, and out of this absurd scientific doubt has sprung this controversy. The Zinc Company yielded to the major's scientific doubt, and that clause was stricken out. But there was another clause inscribed in the deed much more significant than the clause stricken out. Major Farrington tells us that the deed of 1852, first drawn, was a verbatim copy of that of 1848, and a new deed was drawn, which was finally executed, and is the deed of 1852 before us. Neither the deed of 1848 or any of the previous deeds contained any such description in it as the one in this deed of 1852, conveying "all the right, title, and estate of the Sussex Company in the premises described." Now, in the second deed, as drawn, Major Farrington has told us why the words "separate from the zinc" are stricken out, but he has not told us why the words "all the right, title, and estate," &c., were put in. The reason is perfectly manifest from the case. The words were stricken out to prevent the consequence, as suggested by Farrington, of conveying franklinite when separated mechanically from zinc, and the words "all the estate, right," &c., inserted to prevent any inference from the striking out the words "separate from the zinc," that the parties intended to convey less than their whole property. To the question, therefore, why the first clause was stricken out of the deed of 1852, we answer by asking why the second clause was put in. Again, what possible inference can we draw from the fact, that all the stock of the Sussex Company was conveyed to the Zinc Company, and that it is to this day admitted by all parties so rightly held, than that this property was intended to be conveyed by this deed of 1852 by the name of zinc. But it is urged that the evidence shows that, at the date of the deeds, and as late as

1853, the mass or veins of ore in Mine-hill were regarded and known as franklinite; that the ore was so classified and arranged in mineral cabinets and exhibitions; that it was described in scientific treatises, in geological reports, and was so called by the proprietors of the mines and by the miners themselves. But what do all these amount to if it appears by the overwhelming weight of other considerations, some of which we have indicated, that the parties to the deed, at the very time of execution, intended to convey the vein in question by the name of zinc?

But further: when a mineralogist was arranging his cabinet, if he came across a specimen of franklinite from this vein, he would of course classify and arrange it as franklinite, and not as something else, and when he came across a specimen of that portion of the vein which was zinc ore, would he not also arrange and classify that as zinc ore; and would either have the slightest tendency to prove what the owners of the whole vein would call it when they were applied to to sell it by a company chartered for the sole purpose of manufacturing zinc from the ore? So as to its being described as franklinite ore in scientific treatises and geological reports, when treating of franklinite, they would treat this vein as a franklinite vein, and when treating of zinc, they would treat it as a zinc vein; and no inference from either could be justly drawn as to what these parties in these deeds meant to pass by the name of zinc.

But it is further said, that at the dates of these deeds, and up to 1853, this vein was called franklinite by the proprietors of the mines and the miners themselves. It is very true that since 1853, when this controversy was first stirred, and when the Franklinite Company first conceived the pleasant financial operations which might be made by a play upon this word franklinite, the directors and agents of the Franklinite Company have made it a matter of business to call this vein franklinite; but I can find no evidence at all satisfactory that before that time the vein, as a mass, was called franklinite by anybody.

As a specimen of what reliance can be placed upon this kind of testimony, let us take the evidence of Oakes Ames, perhaps the most candid of all the witnesses of the Franklinite Company, and the one most likely to know. He says that he first became acquainted with Mine-hill in 1826; that the bed of ore was then called franklinite. They formed a company about that time, called the Franklinite Manufacturing Company I think, leaving us to infer that, so early as 1826, this vein was so well known as franklinite that a charter was created for the express purpose of manufacturing the franklinite in it. Yet the truth is, that the charter he must have referred to, instead of being called the Franklinite Manufacturing Company, was called in its charter the Frank*lin* Manufacturing Company, and only so called because it was located near the Franklin furnace, and its object, as declared in its charter, was to manufacture not frank-linite but zinc. So that at that time this vein must have been known as zinc ore, even according to the evidence of Mr. Ames. But if this vein was called a franklinite ore, and not zinc, when this deed of 1852 was made, when did it begin to be called so? It certainly could not have been prior to 1821, because before that time the word franklinite had not yet been invented. Doct. Fowler was a learned mineralogist, and finding in this vein a substance different from any other in his cabinet, sent specimens to his correspondents in Europe and America, among others Berthier, a chemist in Paris. He, in 1821, resolved it into its elements, and discovered that it was a new mineral species, and christened it by the name of franklinite, because it had first been found at Franklin furnace, in Sussex county, New Jersey. Now this vein had been known for sixty years before that, and known as yielding a very large per cent. of metallic zinc, and zinc had been known as valuable in commerce from very early times. The vein had been worked for its zinc for sixty years. It is apparent, therefore, that long before 1821 this vein must have had a name, and that name not franklinite, but zinc. It is altogether likely, that after it was thus dis-

covered, that this was a new mineral species, and that this was the only place in the world where it had ever been found. That both Doct. Fowler and this learned correspondent talked a good deal about it, and that the old acquaintance, zinc, was for some time, as is customary in such cases, overslaughed in the halls of the learned by this new-born babe of science. But in their learned descriptions they had no idea or object to discuss or settle the question whether, when Doct. Fowler came to sell this vein to purchasers, he shall change the name of the mass of ore in *situ*, and call it, for commercial purposes, either a zinc ore or a franklinite vein. Though after this discovery, in 1821, this franklinite was to some extent a scientific toy, we can hardly suppose that Doct. Fowler or any other owner would, when he came to seek a purchaser, change the name of this vein from zinc to franklinite. Zinc had been known as valuable in commerce as long as brass had been manufactured. But this franklinite was the most useless iron ore that had been discovered. There it had laid for an hundred years within 300 yards of an iron furnace, tortured in every shape that skill and avarice could put upon it to declare its hoped-for usefulness, and the only thing ever successfully generated between it and the furnace was a *salamander*. The Franklinite Company now in this case ingeniously account for this by swearing that they suspect that its good qualities are not yet fully developed. The evidence fully shows that neither Doct. Fowler or any other owner, when he wished to sell this vein, ever libelled his own property by calling it franklinite. It was never, in any matter of sale, pretended to be called franklinite until this Franklinite Company, in 1853, having sold it as a zinc vein, in order to give this Zinc Company, as their evidence declares, the monopoly of zinc ores in Sussex, sought, by calling it a franklinite ore, to get at the zinc, and put the profits arising from the zinc in their own pockets. Can there be any better evidence that all parties consider and treat this vein as a zinc ore than the avowed and proved acts of the Franklinite Company in this very case?

They pretend that this vein is franklinite, and not zinc; that their sole object is not to manufacture zinc, but to manufacture iron from the franklinite, and yet the first thing they do is to erect not furnaces to manufacture iron, but ovens to extract the zinc. They manufacture nothing but zinc, put it in the market to compete with the Zinc Company, when their avowed object in this deed of 1852 was to give the Zinc Company a monopoly of the zinc manufacturing, and then treat all the ore but the zinc ore as a useless dross. They profess to want only the iron, but they use only the zinc. The evidence, to my mind, that the deed of 1852 was intended by the parties to pass this vein by the name of zinc, is as strong as if the parties had gone upon the mass of ore in *situ*, and had made livery of seizin thereof with all the forms and solemnities of the common law.

As it appears, from what we have said in discussing the effect of this deed of 1848, that this vein of ores passed by it to the Sussex Company, it is unnecessary to say anything further about the claim of title by the Franklinite Company under the deed from Fowler to the Curtises under the deed of 1850 to them, as that only conveys what did not pass by the deed of 1848. I deem it but justice to say in closing, that so far as regards the Boston Company and Oakes Ames, I see nothing inconsistent with the strictest integrity and good faith. I am of opinion that, by the deed of 1852, it was the intention of the parties thereto to pass over the property in dispute under the name of zinc ore; that the property in dispute belongs to the Zinc Company, both in law and in equity ; that the injunction against the Zinc Company should be dissolved, and the injunction against the other parties should be made perpetual with costs.

BROWN, J. The contest in these cases is for the ores of zinc and iron in a tract of land called Mine-hill, in the county of Sussex. The questions are, what title to ores there found the Zinc Company acquired by the deed made to them, dated March 8th, 1852, by the Sussex Zinc and Cop-

per Mining and Manufacturing Company, and what title to such ores the Boston Franklinite Company have, as successors to the Sussex Company, through Oakes Ames and the New Jersey Franklinite Company, by virtue of the exception in the same deed. By it the Sussex Company grants and conveys to the Zinc Company "all the zinc and other ores, except franklinite and iron ores, found or to be found in or upon the *following described premises*, that is to say, that certain farm, piece, or parcel of land, bounded as follows, and consisting of several contiguous tracts. First, the Mine-hill farm." After describing this and other tracts by metes and bounds, the deed proceeds to give license and authority for several purposes, among others, to open shafts, levels, and drains, to mine all sorts of mines and minerals, veins of zinc, copper, lead, silver, gold, and other ores and metals, except the franklinite and iron ores, as therein provided, with free ingress in and upon, and egress from *the said premises* for the purposes aforesaid; and together with all and singular the tenements and appurtenances, &c., and also, all the estate, right, title, interest, property, claim, and demand whatsoever, as well in law as in equity, of the said parties of the first part of, in, and to *the above described premises*, and every part and parcel thereof, with the appurtenances.

This deed conveys *in terms* all the zinc ore found or to be found upon the premises described. The words are, "all the zinc and other ores except the franklinite and iron ores," and to those words there is but one grammatical reading. It is all the zinc ores and all other ores except franklinite and iron ores. The exception is from the ores named generally, and not from the zinc ores, unless franklinite is a zinc ore. The words cannot be held to mean all the zinc ores except iron ores, nor all the zinc ores except franklinite, unless franklinite be a zinc ore. If this interpretation seems at all obscure, it is because the words of the description relate to kinds of property not familiar to us. If the same form of description and exception be applied to things in

common use the doubt will be removed, as if a man should sell all the white-oak and other timber on his farm except the chestnut, chestnut is an exception from the other timber, and not from the white-oak. If the sale was of all the white-oak timber except the chestnut, the clause would not be good English, nor the exception good in law; for the exception would not be from the thing granted but from some other thing, contrary to one of Touchstone's quaint rules. The reading of this exception thus—all the zinc ores except the iron ores—would be just as bad as all the white-oak except the chestnut. Nor would all the zinc ore except the franklinite be any better, for it appears in all the pleadings and in all the proofs, and in the arguments of counsel here, that franklinite is considered a mineral species or an iron ore. It therefore cannot be excepted out of zinc ore.

If, then, the exception applies only to other ores the clause should be read, so far as respects zinc, all the zinc ores found or to be found on the premises described. This would give the Zinc Company all the zinc ores, with the right to mine them, although it might be necessary to break down the franklinite and iron ores to get them. The above construction seems verbally accurate, and should be the legal construction, unless there be some other of which the words are capable called for by the intent of the parties. I know of none such. The deed, with this construction, gives the zinc ore not in mass with such admixtures as were not conveyed, but in species. The language of the description of this deed, and that of Fowler, from whom the Sussex Company got its title, is not apt to a purpose of conveying masses of mixed ore in *situ*, the preponderant ore characterizing the mass. A deed with such intent would necessarily describe such masses with some definiteness as to location or boundary, so far as that can be done in relation to this kind of property. The title to an ascertained vein of ore may be given, and the estate is bounded by the walls of the vein, wheresoever they may lead. So as to veins or 'lodes undiscovered the same rule would apply after discovery, the prevalent ore giving

character to the mass.    But the words in these deeds define
nothing.    The deed from Fowler to the Sussex Company, for
example, conveys " all the zinc, copper, lead, silver, and gold
ores, and also all metals or ores containing metals," &c., and
this deed " all the zinc and other ores."

The descriptions are not of opened mines or ascertained veins
or veins not yet discovered, but are such as are universally used
in deeds to exploring and mining adventurers.    The grantees
of such deeds incur the expense of sinking shafts, opening
levels and  drains, and  removing masses of  no value, in the
full confidence that, whatever they may find within the de-
scription of their deeds worth taking away, no matter how
situated or mixed, they will have the right to take away.
The parties contract in general and sweeping words with
reference, in great measure, to the unseen and unknown, and
thus create questions *inter se* difficult to adjust when the
estate or right is opened to sight and knowledge.    Adverse
rights under ground, without definite description, must of
course be difficult to reconcile; but this cannot control the
construction of deeds creating these rights.    The right to
zinc ore, given by this deed to the Zinc Company, is the
dominant right; for the grant must be taken most strongly
*contra proferentem.*    If zinc ore be found in such combina-
tion with other masses not granted as to be inseparable, these
masses must pass as an incident to the grant.    A *good* ex-
ception can only be made of such thing as may be separated
from the granted thing. 4 *Cruise's Dig.* 288.

But if this result be doubted, or considered *strictissimi
juris,* greater certainty will be found in further considering
the words of this deed.    The deed conveys, it will be re-
membered, all the zinc ore found or to be found upon the
*following described premises,* that is Mine-hill and the other
tracts of land, with the right to mine there, and free ingress
into and upon and egress from the *said premises,* and also all
the estate, property, title, interest, claim, and demand of the
said parties of the first part of, in, and to the *above described
premises.*

2 Q*

What is the meaning here of the words "above described premises?" It is insisted that they mean only the ores granted. Suppose they do, then this part of the deed will read "all the estate, title, and interest of the said parties of the first part of, in, and to all the zinc and other ores, except franklinite and iron ores, found or to be found on the above described lands." Supposing what is understood, this passage, so interpreted, will read thus: all the estate, title, and interest of the grantors of, in, and to all the zinc ores and all other ores except franklinite and iron ores. There being no qualification or exception to the grant of zinc ores, the entire title of the Sussex Company to zinc ore passes. This title embraced all the zinc ores undisturbed by the franklinite exception, for that only existed when franklinite was found separate from zinc.

But, in my judgment, the words "above described premises" do not mean the ores granted. When this word "*premises*" is used in the *habendum* it has a fixed meaning. The office of that part of a deed is to fix with certainty the estate granted, and in that connection the word "premises" does mean the thing granted, as described in what precedes the *habendum*. In this deed the word premises, in the *habendum*, means all the ores granted, together with all the interest of the grantors in the lands described.

But the inquiry is not now as to the meaning of the word in the *habendum*, but in the description of the thing upon which the *habendum* is to have effect. The word *premises* sometimes means any statements which precede the use of the word. Sometimes it means lands, sometimes the thing granted.

In the premises of a deed it cannot mean the thing granted, for that is not ascertained until the description is complete. It is twice used in this same description to mean lands—the ore in the lands and the right to enter upon the lands are described as in or upon the *premises*, that is to say the tracts of land described by metes and bounds. When this word is used the third time in description, and the right of the grantor given in the *above described premises*, it is difficult

to conceive how it can mean anything else than in its previous connections. The following described premises and the above described premises go to the same thing with great exactness. The word is held to its meaning of lands by the qualifying words with certainty. Language affords no greater. The doubt suggested arises not from the words in their connection, but from the effect of such general words upon the subject matter of the grant. It is said that they are broad enough to convey the fee of the lands, and so they are. But they will convey no more than the grantor's title, and he should know whether he means to convey that or not, and insert it or not according to his intent. It is true a case may be put in which such use of the word will seem a strange mistake—one, by the way, very unlikely to be made. As if a man owning the fee of lands should sell all the timber on the premises, together with all his estate in and right to the premises. If the land were of large value and the timber of small value, and the consideration proportioned to the latter, the immediate conclusion of the mind would be, this is a mistake, and but little proof would be required to procure a reform in a court of equity. On the other hand, a case may be put in which it would appear to be in exact accord with the intent of the parties, as if a man owning certainly a third part, and having a questionable title to an additional sixth part of lands, should sell the one undivided third part of the premises, together with all his interest in the premises, there would be little doubt that he meant what he said.

But if it appeared that the deed was given in execution of a contract to convey all his estate in these lands, there could be no doubt at all of his meaning. The intent being ascertained, the deed must be so construed, and both the particular and general description have effect. This rule is stated, in 4 *Cruise's Digest* 257, to be " that when a deed first contains special words, and afterwards concludes in general ones, both words, as well general as special, shall stand, for otherwise the general words would have no effect." The case

of *Sumner* v. *Williams*, 8 *Mass.* 176, cited by the counsel of the Boston Company, will not on examination be found to sustain his position. The action was brought on the covenants of a deed made by administrators. The question was as to their personal liability. The meaning of the word *premises* was argued in the case, and Justice Sedgwick discussed it in his opinion. The other judges did not refer to it. The deed, in all particulars, was different from that now under consideration. The administrators had license to sell the lands of intestate from the Court of Common Pleas. They describe the property in the deed as the equity of redemption of which the intestate died seized in the *premises*, and the *habendum* is to have and hold the same. They covenant that, as administrators, they are lawfully seized of the premises; that they are free from all encumbrances except the mortgage deed and dower of the widow; that they had good right to sell, and would defend the same. The question discussed by Justice Sedgwick was whether the covenants extended to the lands, or to the equity of redemption only. It was not material, and was not decided. I think, however, that in saying the word *same* in the *habendum* meant the thing granted, and that the covenants extended no further, he was clearly right. That deed admitted of such construction, in fact required it. Such was the intent of the parties, appearing in every part of the deed.

I think no reference to extrinsic circumstances to aid in ascertaining the intent of the parties to this deed is necessary. But if a doubt does exist the court may look at such evidence. The original rule is clear in its terms. Latent ambiguities arising from evidence of extrinsic circumstances, when the instrument came to be applied to the subject of it, could be removed by the same kind of evidence; but a patent ambiguity could not be aided in this way. Construction of the words was the only remedy, and when that failed the instrument failed to have effect. This rule has been subjected to many exceptions, by which the rule itself is in fact modified. In general, the court may look at the circum-

stances surrounding the transaction at the time of it, and construe the writing in view of them, if they afford any light. This of course does not extend to the alteration of the instrument, but only to settling the sense of the words when they admit of two or more meanings.

Vice-Chancellor Wigram, in his treatise on extrinsic evidence, page 59, says, " every claimant under a will (and the same rules apply to all instruments) has a right to require that a court of construction, in the execution of its office, shall, by means of extrinsic evidence, place itself in the situation of the testator, the meaning of whose words it is called upon to declare." *Ibid.* 57–8.

It is upon the principle above adverted to, namely, that all writings tacitly refer to the existing circumstances under which they are made; that courts of law admit evidence of particular usages and customs in aid of the interpretations of written instruments, whether ancient or modern, whenever, from the nature of the case, a knowledge of such usages and customs is necessary to a right understanding of the instrument. The law is not so unreasonable as to deny to the reader of any instrument the same light which the writer enjoyed. 2 *Phil. Ev.* 277. " For the purpose of applying the instrument to the facts, and of determining what passes by it, or who take an interest under it, a second description of evidence is admissible, *viz.* every material fact that will enable the court to identify the person or thing mentioned in the instrument, and place the court, whose province it is to declare the meaning of the words of the instrument as near as may be, in the situation of the parties to it."

In the case of *Colpoys* v. *Colpoys*, 1 *Jacob's Ch. R.* 464, the master of rolls says : " In the case of a patent ambiguity, that is one appearing on the face of the instrument, as a general rule, a reference to matter *dehors* the instrument is forbidden. It must, if possible, be removed by construction, and not by averment. But in many cases this is impracticable. Where the terms used are wholly indefinite and

equivocal, and carry on the face of them no certain or explicit meaning, and the instrument furnishes no materials by which the ambiguity thus arising can be removed, if in such cases the court were to reject the only mode by which the meaning could be ascertained, *viz.* the resort to extrinsic circumstances, the instrument must become inoperative and void. As a minor evil, therefore, common sense and the law of England (which are seldom at variance) warrant the departure from the general·rule, and call in the light of extrinsic evidence. The books are full of instances sanctioned by the highest authorities both in law and equity. When the person or the thing is designated on the face of the instrument by terms imperfect and equivocal, admitting either of no meaning at all by themselves or of a variety of different meanings referring tacitly or expressly for the ascertainment and completion of the meaning to extrinsic circumstances, it has never been considered an objection to the reception of evidence of those circumstances that the ambiguity was patent." The master cites *Doe ex dem. Jersey* v. *Smith*, 2 *Brod. & Bing.* 553, in support of his view. In this case Bayley, J., says : " The evidence here is not to produce a construction against the direct and natural meaning of the words—not to control a provision which was distinct and accurately described, but because there is an ambiguity on the face of the instrument; because an indefinite expression is used capable of being satisfied in more ways than one, and I look to the state of the property at the time, to the estate and interest the settler had, and the situation in which she stood in regard to the property she was settling, to see whether that estate or interest or situation would assist us in judging what was her meaning by that indefinite expression."

In the case of *Bradley* v. ·*The Washington Steam Packet Company*, 13 *Peters' R.* 89, Justice Barbour, in delivering the opinion of the court, reviews a number of the decisions on this subject, and sums up the result in the following words : " The cases which we have thus collected together,

from among the very many which exist, will serve to show in how many aspects the question of the admissibility of extrinsic evidence in relation to written contracts has been presented and decided, and in how many forms, according to the various circumstances of the cases, the principle which we have been considering has been applied. Sometimes it has been applied to deeds, sometimes to wills, and sometimes to mercantile and other contracts. In some cases it has been resorted to to ascertain which of several persons was intended, in others, which of several estates. In some to ascertain the identity of the subject, in others its extent. In some to ascertain the meaning of a term, where it had acquired by use a particular meaning, in others to ascertain in what sense it was used when it admitted of several meanings. But in all the purpose was the same—to ascertain by this medium of proof the intention of the parties, when without the aid of such evidence that could not be done so as to give a just interpretation to the contract. Without attempting to do what others have said that they were unable to accomplish, that is to reconcile all the decisions on the subject, we think that we may lay down this principle as the just result, that in giving effect to a written contract, by applying it to its proper subject matter, extrinsic evidence may be admitted to prove the circumstances under which it was made, whenever without the aid of such evidence such application could not be made in the particular case."

The difficulty arises here, if any, in applying the word *premises* to the subject of the contract. According to the natural construction of the word in its connection it means land, and so construed the deed conveys all the title of the Sussex Company in the lands to the Zinc Company. Is there anything in the surrounding circumstances to show that the parties meant any less? The Sussex Company had no title to the surface of the land, only to certain ores. By reference to the deed from Fowler to this company, we find that he conveyed to it all the zinc and other ores there found or to be found, except franklinite, *when it exists separate from*

zinc.  To this exception it may be said, that it amounts to nothing, for franklinite never exists separate from zinc in chemical combination.  The meaning no doubt was to except it when not found in mechanical combination with zinc. There was a plausible reason, therefore, for changing the language of the exception, and it was changed in the deed to the Zinc Company.  *There* they except franklinite without more.  The difference in the effect of these exceptions is unquestionable, and involves all that is in dispute in this cause, but it is not obvious at first reading.  The Zinc Company certainly would not readily perceive that by this difference they would lose any zinc not chemically combined in franklinite.  This leaves open the question, whether the deed was made by the Sussex Company with the intent of reserving part of the ores they acquired from Fowler, and accepted by the Zinc Company with that understanding.  The general clause, including all their title, answers the question exactly if *premises* mean lands, and this answer cannot be put aside unless a good reason can be found for so doing. The reason seems to be the other way.  The exception in the second deed is relieved of the obvious infirmity of the first, while the whole description, taking the general clause as referring to the lands, conveys the same, and no more than the same rights.

The general clause, so interpreted, performs its office, which is to guard against omission or inadequate construction.  *Burton on Real Property* 167, found in the law library.

By the cases above cited, we are allowed to look further into the surrounding circumstances.  One, specially included, is the relation of the grantors to the property or subject of the contract.  At the time of the delivery of the deed to the Zinc Company, which I consider to have been after its acknowledgment, there being no direct proof, the Sussex Company in equity had no property.  They had contracted, for valuable consideration, with the Zinc Company to convey to it all their stock and property of every kind, and had re-

ceived the consideration. When they delivered the deed therefor, in equity they were merely trustees executing a trust—at law, they were performing a contract. It is true that the contract *may* have been waived, or another substituted, but there is no sign of it in the evidence; and where a deed is delivered, which by its usual and natural construction performs a contract between the parties, the clear presumption is that it was so intended.

In coming to the conclusion that the New Jersey Zinc Company, by their deed, acquired all the title the Sussex Company had from Fowler, and that the decree of the Chancellor should be reversed, I beg leave to add, that I have the highest respect for the legal opinions of the Chancellor.

If in the discharge of my duties here I could defer to the opinions of any judge, I would to his; but my convictions upon the points on which I rest my opinion in this case are strong, and I cannot yield them to those of any other mind.

The decision of the Chancellor was reversed by the following vote:

*For affirmance*— Judges WHELPLEY, HAINES, ELMER, COMBS, SWAIN—5.

*For reversal*—Judges VREDENBURG, BROWN, VAN DYKE, OGDEN, CORNELISON, KENNEDY, WOOD—7.